IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Nicholas Heath,<br><br>Plaintiff,<br><br>vs.<br><br>Village of Central City, et al.,<br><br>Defendants. | C.A. No. 3:22-cv-03120-DWD<br><br>**JURY TRIAL DEMANDED** |

**<u>Plaintiff's Memorandum in Opposition to Defendant's Summary Judgment Motion</u>**

## Introduction

Central City Police Chief Nicholas Heath reported that one of his officers had been involved in a racial incident. This case is about the retaliation against Heath for his reporting.

After Heath reported the officer, Village Attorney, Tracy Willenborg, told Heath that the officer—Josh Patten—should be fired. Heath told Josh[1] what Willenborg had said. Josh and his wife Karlie, also a Central City employee, decided that if anything happened to Josh, Karlie would resign.

So after Heath suspended Josh in April 2021, Karlie told Village Board President Ken Buchanan—with whom Karlie enjoyed a close personal relationship—that she wanted to quit. She said Heath had sexually harassed her again.

By "again," Karlie was alluding to the last time she told Buchanan about Heath's conduct, at a November 2020 Board meeting. At the November meeting, a Board Member said

[1] Because Karlie and Josh Patten share a last name, plaintiff is sometimes using only their first names.

Heath had sexually harassed Karlie. But the only incidents discussed were when Heath had looked through Karlie's cellphone three months earlier, in August. Karlie said that Heath had apologized and nothing had happened since. Buchanan said if anything happened again, Karlie should let him know.

Thus, when Karlie told Buchanan it had happened again, Buchanan asked Karlie if she wanted to make a complaint. Three days later, on May 3rd, Karlie handed Buchanan a stack of documents—the complaints.

Central City hired attorney Charles Pierce to investigate. Karlie told Pierce that she wanted Heath fired, but to first give Heath a chance to resign. Pierce interviewed witnesses on May 19th, after which Pierced switched hats to giving legal opinions.

In his May 21st letter to Buchanan, Pierce concluded he could not say if there had been any sexual harassment. But he wrote about his concern for Central City's liability and exposure of embarrassing information if Karlie sued, noting that Karlie had never threatened a lawsuit. Pierce said that if Heath didn't resign, he should be fired.

Heath did not resign. And by May 26th , the decision had been made to fire him. The next day, Willenborg drafted a Notice of Administrative Leave as well as an Order of Termination/Dismissal.

Heath was placed on Administrative Leave at the end of May. And Buchanan signed the Order of Termination/Dismissal on June 27th before any Board vote.

The day after Buchanan signed the Order of Termination/Dismissal, the Board went into Executive Session to discuss Heath's termination. There, Willenborg advised the Board to terminate Heath, giving her reasons. And Buchanan passed around a fabricated document in which

Heath supposedly confessed to Karlie's allegations. Between Willenborg's advice and the fabricated document, the Board voted for discharge.

As for the evidence of what happened at the Executive Session, it is gone. Willenborg instructed Buchanan to take the recording (required under Illinois) home. Defendants have been unable to produce the recording. And the fabricated letter is nowhere to be found.

Heath sued for retaliation under 42 U.S.C. § 1983 as well as under Illinois statutes and common law. Defendants moved for summary judgment on four of the five counts, with essentially the same argument: they fired plaintiff for sexual harassment and Heath cannot establish that their stated reason is pretextual. As discussed below, there are substantial issues of material fact for a jury to decide, so the motion should be denied.

## I. Counts I and II—Claims under 42 U.S.C. § 1983

Plaintiff sued the individually named defendants in their official or individual capacities for retaliation under 42 U.S.C. § 1983. Counts I and II, respectively. The standard for analyzing the evidence under § 1983 is the same as under Title VII. *Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012) abrogated on other grounds by *Ortiz v. Werner Ent., Inc.,* 834 F.3d 760, 764 (7th Cir. 2016). Plaintiff can show evidence of retaliation either indirectly, under the *McDonnell Douglas v. Green* framework or directly, through evidence of causation. Defendants do not dispute that plaintiff engaged in protected activity or that he was discharged. So the only legal issue is whether there is sufficient evidence of "causal connection."

**A. Direct case.** To survive summary judgment, plaintiff must show he engaged in protected activity, suffered an adverse action, and that there is a causal link between plaintiff's protected activity and adverse action. *Lewis v. Wilkie,* 909 F.3d 858, 866 (7th Cir. 2018), citing *Sitar v. Ind. Dep't Transp.*, 344 F.3d 720, 728 (7th Cir. 2003). Defendants argue that the causal standard is "but for," citing *Nicholson v. City of Peoria*, 860 F.3d 520 (7th Cir. 2017. The U.S. Supreme Court elaborated on the meaning of "but for" in the context of Title VII when "but for" causation is required. *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 656 (2020). The Court held that the "but for" standard means that "a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law."

Thus, defendants cannot avoid liability by citing some other reason for discharging plaintiff, such as sexual harassment. So long as plaintiff's protected activity was one but-for cause of the decision to discharge him, that is enough to trigger 42 U.S.C. § 1983.

In *Sitar*, the court found that causal link can be established not only with timing, but also based on reactions to the protected activity from which a jury could infer unlawful motive.

**Timing and Karlie and Josh's reactions:** Karlie and Josh knew about plaintiff's protected activity on March 30, 2021, when plaintiff told Josh about his possible discharge. ¶ 52.[2] By no later than April 11th (based on the date of the texts), Josh told Board Member Tisch Daugherty, that plaintiff wanted to get Josh fired. ¶ 59. And if Josh was fired, Karlie would quit and both Josh and Karlie would sue. ¶ 65. And that is essentially what happened. Plaintiff disciplined Josh on April 20th. ¶ 72. Karlie came into the office "madder than hell" and said she would quit

[2] References are to the numbered paragraphs from Plaintiff's Statement of Additional Facts.

and that plaintiff had been sexually harassing her. ¶¶ 74, 75, 77. Thus, on May 1st, Karlie told Buchanan that she wanted to quit. ¶¶ 78-79. She told Buchanan plaintiff had sexually harassed her, but when he asked if she wanted to complain, it took her three days to come up with the dated complaints that are now Exhibit E. ¶ ¶ 78-81.

**Karlie and Buchanan's relationship:** Karlie and Buchanan enjoyed a close personal relationship such that she would go to his home—with Josh's knowledge—and Josh would not know why. ¶ ¶ 99-100. Indeed, Buchanan protected Karlie from misconduct allegations. ¶ ¶ 101-103. A jury could reasonably infer that Buchanan would follow Karlie's lead on wanting plaintiff gone. And so, to guarantee plaintiff's discharge at the June 28th vote, he circulated a fabricated letter in which plaintiff admitted Karlie's allegations. ¶ ¶ 149-151.

**Cat's Paw:** Defendants can be liable when persuaded to act based on another person's unlawful bias. *McDaniel v. Progress Rail Locomotive, Inc.* 940 F.3d 350 (7th Cir. 2019)(explaining cat's paw theory of liability). In other words, Central City (and Board Members in their official capacity) can be liable for discharging plaintiff if they were persuaded to act—even unwittingly—based on others' unlawful bias. Karlie and Josh had the unlawful bias, shared with Buchanan. They then persuaded the Board to act.

**Karlie told Pierce she wanted plaintiff gone; within days Buchanan decided to discharge plaintiff days later:** Karlie told Charles Pierce, who was hired to investigate her allegations, that she wanted plaintiff gone but suggested giving him a chance to resign. ¶ 106. Within days of Karlie meeting with Charles Pierce, the decision was made to discharge plaintiff. ¶ ¶ 136, 137.

A jury could reasonably infer that Buchanan made the decision so early based on: (1) his

close relationship with Karlie (¶ ¶ 99-103); communications from Pierce to Buchanan before and during the investigation (¶ 104); (b) Pierce's May 21st letter to Buchanan which told him to give plaintiff a chance to resign and if he didn't resign to fire him (¶ ¶ 109, 110); (c) Pierce and Willenborg's May 26th communications about the decision to fire plaintiff, with language showing the decision had been made (¶ ¶ 136, 137); and, (d) Willenborg having drafted the Order of Termination/Dismissal on May 27, 2021 even though the Board did not vote to terminate plaintiff until June 28, 2021. ¶ 144. Buchanan's decision to circulate a fabricated letter from plaintiff at the June 28th Executive Session—in which plaintiff supposedly confessed to sexually harassing Karlie ( ¶ ¶ 149-151) was what he could do to deliver the desired outcome.

**B. Indirect case.** Plaintiff can survive summary judgment in a retaliation case using the indirect method established under *McDonnell Douglas v. Green*, 411 U.S. 792, 802-803 (1973). The only aspect of the *McDonnell Douglas* burden-shifting framework that defendants appear to challenge is the pretext phase which comes after defendants articulate a legitimate nonretaliatory reason for the action at issue, that is, the discharge.

**Articulation of legitimate nonretaliatory basis.** Defendants can articulate a legitimate nonretaliatory reason through the introduction of admissible evidence. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507 (1993).

Defendants' articulation of a legitimate nonretaliatory reason for discharging plaintiff, through admissible evidence, is at Def. ¶ 34, which plaintiff admitted in part. The only part of Def. ¶ 34 supported by the record was the interrogatory answers. Those answers show the claimed reason for discharge as "the sexual harassment."

**Pretext.** Under *McDonnell Douglas*, plaintiff then has the burden to establish that the

articulated reason—the sexual harassment—is pretextual.

**Standard for establishing pretext.** Once plaintiff offers evidence allowing a jury to infer pretext, the inference is that the motive was unlawful. *Runkel v. City of Springfield*, 51 F.4th 736, 744 (7th Cir. 2022). In other words, a dishonest explanation permits the inference that the real reason was unlawful. *Id., citing Hasham v. California St. Bd. of Equalization,* 200 F.3d 1035, 1045 (7th Cir. 2000)("Pretext does not require that plausible facts presented by the defendant not be true, only that they not be the reason for the employment decision.") As the Seventh Circuit made clear in *Hasham*, pretext does *not* require a plaintiff to show pretext "and some additional evidence of discrimination to permit the inference of unlawful intent." Such a requirement would conflict with *St. Mary's Honor's Center v. Hicks*, 509 U.S. at 511. *Hasham*, 51 F.4th at 745 n. 3.

**Evidence of pretext.** Evidence from which a jury could infer that defendants' articulated reason is unworthy of credence included the following.

**1.** The evidence listed above in the "Direct case."

**2.** When the Board was in Executive Session before its vote to terminate, Buchanan presented the Board with a fabricated document, supposedly signed by plaintiff, in which plaintiff admitted to sexually harassing Karlie. ¶ 149, 150. Plaintiff never signed such a document. ¶ 151. One Board Member admitted having relied on the letter as the sole reason for voting for discharge. ¶ 152. A jury could reasonably infer that the other Board Members took a confession of sexual harassment into account. In fact, it would have been counterintuitive for them to ignore plaintiff's confession of sexual harassment when deciding to fire him because of sexual harassment.

**3.** Village Attorney Tracy Willenborg told the Board to vote for termination and gave them reasons. But her reasons are not in the Minutes. ¶ ¶ 146, 147. And defendants failed to produce the recording of the meeting—a recording they were required to make. ¶ 1, 2, 13. After giving her advice, Willenborg told Buchanan to take the recording home with him. ¶ 9. And now Central City cannot account for the recording. ¶ 11.

Under 5 ILCS 120/2.06, Central City needed to keep a verbatim record of its closed meetings in the form of an audio or video recording. ¶ 14. The public officials in Central City had been advised of their obligations. ¶ 12. A jury could reasonably infer that the contents of the recording would have been unfavorable to defendants' position here, that is, that the reason for termination was "sex discrimination. *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998)(requirements for seeking adverse inference based on destruction of documents). But even without an adverse inference instruction, a jury could reasonably infer—based on common sense—that Willenborg and Buchanan failed to hang on to the recording because the contents would undermine their position.

**4.** Karlie's complaints are suspicious.

First, Karlie did not tell Josh about the complaints. ¶ 82.

Second, while the complaints have different dates at the top, Karlie admitted writing them all at the same time. ¶ 82.

Third, it took Karlie three days to come up with the complaints once Buchanan asked Karlie if she wanted to make a complaint. ¶ ¶ 78-81.

Fourth, the contents of the complaints are contrived.

- The first three complaints are dated November 17, 2021, but backdated to August.

In all three, Karlie stated she had brought up all issues the day before—at the November 16th Board Meeting. But a comparison with the Minutes, which Karlie prepared, shows that she did not bring up the issues she wrote about except for plaintiff looking through her cellphone. ¶ 84, 85.

- The complaint dated December 18th cannot be accurate, since neither Karlie nor Josh worked that day. And Josh told Pierce he did not know of any sexually harassing conduct at that time. ¶ ¶ 86-90.
- The complaint dated February 9, 2021 is particularly troublesome because between Karlie and Josh, they described the event as having occurred on three dates. Karlie described an event, dated February 9th, in which plaintiff said something about bending Karlie over a table (¶ 91). But Josh described the same event as having occurred in the summer of 2020 (¶ 92) and later, to Pierce, Josh said the event occurred two weeks before his May 11th interview. (¶ 93). In the May 21st letter, Pierce said—inaccurately—that plaintiff admitted it was likely he commented that he'd like to see Karlie bent over a table even though whether the conduct had occurred was so suspect to begin with. ¶ 131. Plaintiff had not admitted to such conduct. ¶ 132.
- The March 9th complaint was exactly four weeks after the February 9th complaint, and the April 6th complaint was exactly four weeks after the March complaint. ¶ 94, 95. A jury could reasonably find those dates suspicious.
- The April 14th and April 20th complaints were not sexual. ¶ ¶ 96, 97, 98.

**5.** Pierce's letter includes false information.

First, Pierce included powerful "me-too" evidence by claiming that Buchanan told him that another female officer resigned because of plaintiff. That statement was untrue. ¶ ¶ 118, 119.

Second, Pierce warned about potentially damaging information that would come out if the case was litigated including plaintiff's previous harassment of interns and video of plaintiff having sex with in Village Hall. ¶ 120, 124. Central City had no female interns. The supposed source of the intern rumor, Josh, denied Central City had interns. Pierce testified that he did not check whether there were interns because he did not think it was relevant to Karlie's allegations (¶ 123), and yet he included the rumor in his letter. Central City had no video of plaintiff. ¶ ¶ 121, 122, 125.

Third, Pierce said that during the investigation, plaintiff accused Josh of telling him that if he wanted to see Karlie's breasts, all he had to do was ask and Karlie would show them. ¶ 126. In fact, Sgt. Hinkle is the person to whom Josh made the statement about looking at Karlie's breasts. ¶ 127, 128.

Fourth, Pierce said plaintiff had retaliated against Josh for Karlie's complaints of sexual harassment. In other words, that the discipline against Josh was plaintiff's retaliation for Karlie complaining. ¶ 113-115. Pierce explained that Karlie made her complaints—and he was referring to the group of complaints that are Def. Exh. E—on April 11th. ¶ 115. And plaintiff did not discipline Karlie until April 20th. So Pierce misstated the date Karlie turned her complaints into Buchanan, And he did not account for the ongoing communications about discipline between plaintiff and Tracy Willenborg from early March to April 12, 2021 (¶ ¶ 47-51, 53-56, 580 or Willenborg's

March 25th recommendation to discharge Josh.

Fifth, Pierce stated that Sgt. Hinkel said plaintiff should have stopped investigating Josh when he knew Karlie had a sexual harassment complaint. Hinkel said the opposite. ¶ ¶ 129, 130.

**6.** Defendants repeat a falsehood in their brief which is essential to their denial that they retaliated against plaintiff. Defendants state: "The evidence is clear that Karlie Patten submitted her Complaints (Exhibit E) prior to discipline of Joshua Patten." Doc. 90, p. 13.

Defendants cite no portion of the record or paragraph number to support their claim. But defendants admit that on the day Karlie gave Buchanan the complaints, Buchanan drove the complaints to Tracy Willenborg. Def. ¶ 21. Buchanan drove the complaints to Willenborg on May 3, 2021 (¶ 78); plaintiff disciplined Josh on April 20, 2021. ¶ 72. So Karlie Patten did not submit her Complaints (Exhibit E) prior to the discipline of Joshua Patten.

**7.** Willenborg claimed dismissal of plaintiff required a recommendation by the Police Committee which would be reflected in the Police Committee's minutes. ¶ 4, 140. Defendants failed to produce such minutes, which they were required to keep. ¶ ¶ 1, 2. In any event, Willenborg gave different information to the Board at the June 28th Executive Session: employees were subject to dismissal by Buchanan with the advice and consent of the Board. ¶ 141.

**8.** Pierce signed the Order of Termination/Dismissal on June 27th, the day before the Board voted on termination. ¶ 143.

**9.** As discussed elsewhere, at the Executive Session, Buchanan circulated a fabricated letter in which plaintiff supposedly admitted Karlie's allegations. ¶ ¶ 149-151. The letter is gone. ¶ 154. In other words, Buchanan sealed the deal with a fabricated confession because he

was not confident of the outcome absent a confession.

In sum, there is substantial evidence from which a jury could reasonably infer that defendants' reason is pretextual and so summary judgment should be denied.

## II. Counts IV and V—Common law retaliatory discharge and Whistleblower Act

Defendants moved for summary judgment on plaintiff's common law retaliatory discharge claim. The elements are: (1) discharge; (2) in retaliation for activities (causation); and, (3) the discharge violates a clear mandate of public policy. *Michael v. Precision All. Grp., LLC*, 2014 IL 117376, ¶ 31. Defendants make two misstatements about *Michael.*

First, contrary to defendants' argument, *Michael* is not an Illinois Whistleblower Act case; the case predates the Whistleblower Act.

Second, defendants argue that under *Michael*, if an employer comes forward with a valid, nonpretextual basis for discharging its employee, there is no causation. *Def. Brf.*, p. 15. Not so. Defendants left out part of the standard. The court in *Michael* held that providing a reason for discharge does not automatically defeat a retaliatory discharge claim. Causation is defeated only when an employer comes forward with a valid nonpretexual reason for discharge *and* the trier of fact believes the reason. *Id.*, at ¶ 32.

The valid nonpretextual reason defendants offer is "sexual harassment." Def's ¶ 34.

A jury could reasonably infer that the reason is not worthy of belief based on the same evidence plaintiff described in Part I above in connection with the Direct and Indirect cases.

## III. Count III—Illinois Human Rights Act

Defendant Central City did not move for summary judgment on Count III, plaintiff's claim under the Illinois Human Rights Act. But if Central City had moved on the same basis —

causation—as it moved on other counts, plaintiff's arguments would have been the same as his arguments for Count I.

## Conclusion

For the reasons stated in this Memorandum as well as Plaintiff's Response to Defendants' Statement of Facts and Plaintiff's Statement of Additional Material Facts, plaintiff asks the Court to deny defendants' motion.

/s/ Ferne P. Wolf
SilversteinWolf, LLC
Ferne P. Wolf
fw@silversteinwolf.com
530 Maryville Centre Dr., Suite 460
St. Louis, Missouri 63141
Telephone: 314 744-4010